STATE of Missouri, Appellant

v.

**John D. GORDON, Jr., Respondent.**

No. 18534.

Missouri Court of Appeals,
Southern District,
Division One.

March 1, 1993.

Motion for Rehearing or Transfer to
Supreme Court Denied March 22, 1993.

Application to Transfer Denied
May 25, 1993.

Bradford E. Ellsworth, Pros. Atty., Texas County, Houston, for appellant.

Ronald D. White, J. William Turley, Williams, Robinson, Turley & White, Rolla, for respondent.

PARRISH, Chief Judge.

John D. Gordon, Jr. (defendant) is charged with murder in the second degree, § 565.021.1(1),[1] and with armed criminal action, § 571.015. The charges were filed in Texas County. The case was transferred to the Circuit Court of Pulaski County on a change of venue. This appeal is from an order the trial court entered that suppressed evidence seized by law enforcement officers in the course of executing a search warrant. The interlocutory appeal is permitted by § 547.200. This court affirms in part and reverses in part.

> In reviewing the trial court's order suppressing the evidence in question, the facts and reasonable inferences therefrom are to be stated favorably to the order challenged on appeal. *State v. Blair*, 691 S.W.2d 259, 260 (Mo. banc 1985). The correctness of the trial court's decision is measured by whether the evidence is sufficient to sustain the finding. *Id.; State v. Cross*, 757 S.W.2d 613, 614 (Mo.App.1988).

*State v. Woods*, 790 S.W.2d 253, 254 (Mo. App.1990).

Defendant and the victim, Valerie Taylor (Valerie), lived together in California. They came to Missouri intending to live in a trailer they had placed on property in Texas County owned by defendant's mother, Paula Gordon. They changed their plans and moved into the home of Paula Gordon in Mountain Grove, Missouri.

Sergeant Douglas Loring of the Missouri State Highway Patrol was contacted by members of Valerie's family in July 1991 who reported that Valerie was missing. Valerie was last seen on July 10. Defendant was interviewed and stated that he had seen Valerie on that date; that they "had been at a tavern drinking some"; that defendant had taken Valerie's children[2] to his mother's residence; that defendant and Valerie left the residence, got into an argument and he "let her out near Wal-Mart store in Mt. Grove on Highway 60, business route."

On July 23, 1991, law enforcement officers obtained the consent of defendant and his mother to search the mother's farm where defendant's trailer had been taken. The gate to the farm was locked. "[T]he Gordons opened the gate and allowed [the officers] to go through with them." Valerie's body was found in a wooded area. The body was "very decomposed." The body was not positively identified at the time it was discovered, but the shoes, hair and jeans matched descriptions of the victim's appearance and clothing when she was last seen. There was also a ring near the body like one she was known to wear. Sergeant Loring thought her body had been dragged because of "[t]he arrangement of the clothing that she was wearing." He testified at the suppression hearing:

> Her top was pulled up over her head. She had been—the way the clothing was, she had been dragged. You could tell, because it was up over her head.

He believed the body was Valerie Taylor and "that she had been killed."

There were three .12 gauge shotgun shell casings found at the property where

---

1. References to statutes are to RSMo 1986 unless otherwise stated.

2. Although there are references to "children" of Valerie Taylor in the record on appeal, the children are not identified by number or names (other than Marie Taylor to whom reference is

made in the supplemental affidavit that was filed with the application for search warrant) nor is there any explanation of their presence, i.e., whether they came from California with their mother and defendant or had not been with her prior to when she came to Missouri.

the body was discovered. The shotgun shell casings were found a considerable distance from the body, "at least three hundred feet from where the body was found."

On July 23, 1991, the day the body was discovered, a search warrant was obtained from the Circuit Court of Wright County to search the residence of Paula Gordon[3] in Mountain Grove for "a .12 gauge shotgun and evidence of destruction of personal items belonging to Valerie Taylor." The application for the search warrant was made by a deputy sheriff of Wright County, Dan Parker, as permitted by § 542.-276.1, RSMo Supp.1990. It was supplemented by the affidavit of Deputy Sheriff Parker. §542.271.3, RSMo Supp.1990.

After obtaining the search warrant, a search was conducted by the Wright County Sheriff. Property and material were seized. Defendant filed a motion to suppress the evidence. After an evidentiary hearing, the trial court granted the motion. It ordered that the property and material seized as a result of the search be suppressed; that it be excluded from evidence.

■ The state's brief purports to set out four points relied on. However, none of those points comply with the requirements of Rule 30.06(d). They do not "state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous." *Id.* They present nothing for appellate review. *See Thummel v. King,* 570 S.W.2d 679, 685 (Mo. banc 1978); *see also Bentlage v. Springgate,* 793 S.W.2d 228, 229–31 (Mo.App.1990); and *State v. Ruhr,* 533 S.W.2d 656, 658 (Mo.App.1976). Because of the deficiencies in the points relied on, this court's review is limited to a determination of whether the trial court committed plain error that affected substantial rights so as to result in manifest injustice or a miscarriage of justice. *State*

*v. Johnson,* 586 S.W.2d 437, 441 (Mo.App. 1979); Rule 30.20.

The trial court found that the search warrant was invalid. It found that: (1) the application for the search warrant was defective because "it was executed by a law officer and not the Prosecuting Attorney or his designated assistant;" (2) neither the application for the search warrant "nor any ... supporting documents" provided a basis upon which the issuing judge could have found "probable cause to issue the warrant;" and (3) the judge who issued the warrant was provided information that was not part of the application for search warrant or the affidavit that was filed in support of that application.

## THE APPLICATION FOR SEARCH WARRANT

■ The application for search warrant was not signed by a prosecuting attorney. It was signed by Dan Parker who, in an affidavit given in support of the application, stated that he was "a duly commissioned Deputy of the Wright County Sheriff's Department." At the suppression hearing, Deputy Sheriff Parker stated his occupation or profession to be "a Deputy Sheriff." He testified that he was a deputy sheriff of Wright County in the month of July 1991.

Section 542.276, RSMo Supp.1990, prescribes who may apply for search warrants and the applicable procedures. The pertinent part of the statute states:

1. Any peace officer or prosecuting attorney may make application under section 542.271[4] for the issuance of a search warrant.

2. The application shall:

· · · · ·

(8) Be signed by the prosecuting attorney of the county where the search is to take place, or his designated assistant.

· · · · ·

---

3. The premises that were searched were described in the search warrant as: 600 Chapman Street, Mountain Grove, Missouri. That was the house where defendant and Valerie lived with defendant's mother, Paula Gordon.

4. § 542.271 describes what a warrant may be issued "to search for and seize, or photograph, copy or record."

Section 542.276.2(8), RSMo Supp.1990, was enacted in 1989 (Conference Committee Substitute for House Committee Substitute for Senate Bills 215 and 58, 1989 Mo. Laws p. 597). It became effective August 28, 1989. It was in effect at the time the application for search warrant was filed. The record on appeal provides no explanation regarding why the Prosecuting Attorney of Wright County or a "designated assistant" did not sign the application for search warrant. Although the requirement that the prosecuting attorney sign an application for search warrant was added in 1989 by C.C.S.H.C.S.S.B. 215 and 58, the provision in § 542.276.1, that permitted "[a]ny peace officer or prosecuting attorney" to make application for a search warrant was not changed. The bill amended § 542.291, the statute that directed the manner in which a search undertaken by reason of a search warrant was to be conducted. It amended § 542.291 by adding a subparagraph that states:

A copy of the itemized receipt of any property taken shall be delivered to the office of the prosecuting attorney in the county where the property was taken within two working days of the search.

§ 542.291.5, RSMo Supp.1989.[5] It made no other amendment to the search and seizure statutes.

This court does not perceive that the enactment of § 542.276.2(8), RSMo Supp. 1989, was intended to establish a basis for reviewing courts to declare a search warrant issued upon an application signed by a peace officer rather than a prosecuting attorney invalid. The legislature did not include failure of a prosecuting attorney to sign the application for a search warrant as a statutory basis for deeming a search warrant invalid. *See* § 542.276.10, RSMo Supp.1989. It is more plausible that §§ 542.276.2(8) and 542.291, RSMo Supp. 1990, were enacted to emphasize to law enforcement officers that applications for search warrants are technical pleadings that should be scrutinized by legal counsel prior to filing, and that prosecuting offi-

cials should be promptly notified regarding what property has been taken as a result of the execution of a search warrant.

The area of expertise of law enforcement officers does not ordinarily include preparation of legal documents. A trial judge from whom a search warrant is sought is entitled to an application that is technically correct. Section 542.276.2(8), RSMo Supp. 1990, attempts to accomplish this by assuring that the legal advisor to the county's law enforcement officers, the prosecuting attorney, has not been bypassed when a search warrant is being sought.

■ A trial judge who is presented with an application for search warrant that has not been signed by a prosecuting attorney as prescribed by § 542.276.2(8), RSMo Supp.1990, may, by the exercise of sound judicial discretion, refuse to consider the application. In this case, the associate circuit judge who issued the search warrant did not exercise that discretion.

This court, in the course of appellate review, does not find the fact that the application was signed by the peace officer who applied for the search warrant (and whose signature was verified) rather than the prosecuting attorney to be a basis for declaring the search warrant invalid. The signing of the application by the prosecuting attorney was not a prerequisite to the associate circuit judge's authority to issue search warrants. The trial court's determination to the contrary resulted in a manifest injustice to the state. The state's right to present evidence obtained by reason of its execution of a lawfully issued search warrant is a substantial right. The trial court's declaration that the search warrant was invalid due to failure of a prosecuting attorney to sign the application is plain error.

### THE AFFIDAVIT IN SUPPORT OF THE APPLICATION

■ The second finding upon which the trial court relied in determining that the

---

5. §§ 542.276–.301, RSMo Supp.1990, (the search and seizure statutes) are identical to the same

provisions in the 1989 Cumulative Supplement.

search warrant was invalid was the determination that the application and the supporting affidavit were not sufficient to enable the issuing associate circuit judge to have found "probable cause to issue the warrant."

Defendant correctly points out that the judge from whom a search warrant is sought may not consider oral testimony in determining whether there is probable cause to issue the search warrant but is to consider only the written application together with any supplemental written affidavit. §§ 542.276.3–.4, RSMo Supp.1990.

 In considering a supplemental affidavit, "[t]he ... judge ... is entitled to a common sense reading of the entire supporting affidavit." *State v. Pennington*, 642 S.W.2d 646, 648 (Mo.1982). The assessment a judge makes in determining whether to issue a search warrant is based on a lesser standard of proof than that required to convict an accused of a crime. In *State v. Rohrer*, 589 S.W.2d 121 (Mo.App.1979), this court pointed to the explanation in *U.S. v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), regarding appropriate considerations in testing and interpreting an affidavit that undertakes to show probable cause for the issuance of a search warrant.

> [T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, ... must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

380 U.S. at 108, 85 S.Ct. at 746, as quoted in *Rohrer*, 589 S.W.2d at 122.

*Rohrer* further explained:

> Other principles to be observed include the following: "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli v. U.S.*, [393 U.S. 410, 419, 89 S.Ct. 584, 590–91, 21 L.Ed.2d 637 (1969)].

589 S.W.2d at 122.

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court explained:

> Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli* [v. U.S., 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)] at 419[, 89 S.Ct. at 590–91.]

*Id.* 462 U.S. at 235, 103 S.Ct. at 2330. The court held that the determination of whether there was probable cause to issue a search warrant was to be based upon a "totality-of-the-circumstances approach," *Id.* at 230, 103 S.Ct. at 2328, explaining:

> "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." [*Brinegar v. U.S.*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)], at 175, 69 S.Ct., at 1310.

*Id.* 462 U.S. at 231, 103 S.Ct. at 2328–29. And,

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair prob-

ability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Id.* at 238–39, 103 S.Ct. at 2332–33.

The affidavit that Deputy Sheriff Parker gave in support of the application for search warrant states:

COMES NOW, Dan Parker, of full age and being duly sworn, do depose and state the following:

1. That I am a duly commissioned Deputy of the Wright County Sheriff's Department and that I was acting in my official capacity during all of the events described hereinafter.

2. That I am a participant in a homicide investigation into the death of Valerie Taylor which occurred on or about 11 July 1991 in Texas County, Missouri.

3. That at the scene where the body of Valerie Taylor was discovered, three (3) .12 gauge shotgun shell casings were found.

4. That during the course of the investigation, Marie Taylor, 14 years of age, daughter of the victim, said that her mother had been living with John Gordon and his mother, Paula Gordon, at 600 Chapman Street, Mountain Grove, Missouri. She said that John Gordon owned three (3) guns which he kept in the house at that address. One of those three (3) guns was a .12 gauge shotgun.

5. That a confidential informant stated to me that John Gordon had approached her to ask her to burn some of Valerie Taylor's personal belongings and that when she refused, he told her that he and his mother, Paula Gordon, had already burned Ms. Taylor's purse and some of the contents of the purse in the kitchen sink at 600 Chapman Street, Mountain Grove, Missouri.

6. That based upon the above information, I verily believe that the residence at 600 Chapman Street, Mountain Grove, Wright County, Missouri, is being used to store a .12 gauge shotgun and the evidence of destruction of personal items

belonging to Ms. Taylor and request a warrant to search said premises.

The following may be gleaned by a common sense reading of the affidavit. Valerie Taylor died on or about July 11, 1991. On the date of the affidavit, July 23, 1991, a homicide investigation was in progress. Deputy Sheriff Parker was participating in that investigation. The body of Valerie Taylor had been found. Three .12 gauge shotgun shell casings were found in the area where the body was located. Based upon information provided by the victim's 14–year old daughter, Valerie lived with defendant and defendant's mother at 600 Chapman Street in Mountain Grove, Missouri. Defendant owned three guns. The guns were kept in the house where he lived with Valerie. One of the guns was a .12 gauge shotgun. Deputy Sheriff Parker was told by a person whose identity was undisclosed in the affidavit that defendant asked that individual to burn some items that belonged to Valerie Taylor, and that defendant told this person that he and his mother had already burned some items that belonged to Valerie. Defendant told this person that this had been done in the kitchen sink in the house where he and his mother lived.

Deputy Sheriff Parker stated in the supplemental affidavit that, based upon the facts he recited, he believed that the residence at 600 Chapman Street in Mountain Grove was being used to store a .12 gauge shotgun and evidence of destruction of property that belonged to Valerie Taylor.

Defendant's brief contends that the affidavit of Deputy Sheriff Parker is deficient because "[t]he Affidavit fails to establish why the 12 gauge shotgun is relevant to the homicide, or why it constitutes 'evidence of the commission of a criminal offense' in accordance with Section 542.271.-10(1) RSMo." Defendant argues that because there is no statement that the body had been shot with a .12 gauge shotgun or any other firearm, there was nothing that permitted the associate circuit judge that issued the search warrant to find probable cause to believe the body had been shot

with a .12 gauge shotgun. This court does not believe that conclusion is necessary.

A common sense reading of the affidavit reveals that evidence that a .12 gauge shotgun had been fired was found in an area in the vicinity where the victim's body was found. Since defendant had a .12 gauge shotgun, if his shotgun was the one that fired the expended casings, one might infer that he had been near the location where the body was found. As such, recovery of the weapon in defendant's possession could provide evidence of criminal activity in that if a determination was made that his shotgun fired the shotgun shell casings that had been found, it was inferable that defendant had been at the scene where the body was discovered. Therefore, the shotgun that was identified as having been at the premises to be searched, the then residence of defendant, could constitute evidence of criminal activity by defendant, "evidence of the commission of a criminal offense." § 542.271.1(1).

The duty of the trial court was to ensure, from a totality of the circumstances revealed in the application for search warrant and the supporting affidavit, that the issuing judge had a substantial basis for concluding that there was a fair probability that recovery of the shotgun would produce evidence of the crime that was being investigated and the evidence could be found in the place for which the search warrant was sought. There was evidence from which the issuing judge could have so found.

Defendant further complains that the affidavit does not adequately establish why the shotgun was thought to be kept at 600 Chapman Street; that the statement that a .12 gauge shotgun was kept at that location is attributed to the victim's 14–year old daughter and that the information does not state when the .12 gauge shotgun was at the house. Defendant cites no case for the proposition that this fatally flaws the supplemental affidavit. Considering the totality of the circumstances, the evidence does not warrant a determination that the application and the supporting affidavit are so incomplete in this respect to fatally flaw the search warrant.

Defendant also suggests that the affidavit of Deputy Sheriff Parker failed to establish that possible destruction of the victim's personal property constituted evidence of a criminal offense. Evidence of an attempt to destroy personal property of the victim of an undiscovered homicide could constitute evidence of a criminal offense. An inference from such conduct might be that the person attempting to destroy the personal property of the victim intended to eradicate evidence of the victim's presence. By so doing, a homicide might remain undiscovered. It might appear that the victim had removed the property to another location and was, therefore, likely alive.

Defendant also complains about the reference in paragraph 5 of the affidavit to an unnamed, confidential informant. The statements attributed in the affidavit to the undisclosed informant include statements made by defendant to that informant. It was inferable from the affidavit that Deputy Sheriff Parker knew the identity of the informant. The informant could be called upon to testify at trial. Statements made by this defendant would be admissible evidence in a criminal case in which he were the one charged. In view of the other suspicions made evident by the supporting affidavit, this revelation was relevant for purposes of determining whether there was probable cause to issue a search warrant.

Mindful of the admonition in *Ventresca,* and the guidance provided by *Gates,* this court concludes that the affidavit of Deputy Sheriff Parker, albeit not replete with "[t]echnical requirements of elaborate specificity," suffices to show probable cause that the shotgun could be evidence of the commission of a criminal offense by defendant and, for purposes of permitting a search for the weapon, the affidavit of Deputy Sheriff Parker was sufficient. The totality of the circumstances was sufficient to constitute probable cause for the associate circuit judge to issue the search warrant.

The evidence before this court is not sufficient to sustain the finding of the trial court that the search warrant was invalid. The trial court's determination that the affidavit did not provide a basis upon which a search warrant could issue was erroneous so as to result in a manifest injustice to the state. It constitutes plain error.

## INFORMATION NOT PART OF THE APPLICATION OR THE AFFIDAVIT

■ The third finding of the trial court, that the associate circuit judge who issued the search warrant was provided with information other than statements in the application and affidavit, is of no consequence. As determined, *supra*, the written application and the supplemental affidavit provide probable cause for the issuance of the search warrant.

## THE QUESTION OF GOOD FAITH

■ The officer executing the search warrant in this case, the Sheriff of Wright County, made and signed the "RETURN AND INVENTORY" identifying property that was seized. Although the search warrant required that the search be for "a .12 gauge shotgun and evidence of destruction of personal items belonging to Valerie Taylor," the inventory lists a variety of other items. It included six guns, only one of which was a .12 gauge shotgun (identified on the inventory as "1—Winchester Model 1400–12GaMK# N833890"). Also listed were "12 ga shells and 410 Shells" and "22 rifle shells," together with the following:

1—land and sky straw & glass
1—pipe wood
 Keys
1—Knife Model 400
1—Ruger mag clip
 pipe & parperhalia [sic]
 letters
 buttons & glass out trask burner
 watchband
 cloth
 hair
 11 shells

The sheriff, Leo Bradshaw, testified at the suppression hearing. He was asked the following questions and gave the following answers:

Q. When you were searching this residence, who made the decision to take each of these items?

A. I think each officer made the—picked the items up, and then I—would give them to me, and then I—it was my decision, I guess, because I had the search warrant.

Q. Okay. Is there any items that they brought to you that you didn't take?

A. Not that I know of. I tell you, everything that was taken would be on the search warrant.

Q. No, I meant were there any items they brought to you and you said, "No, we're not going to take that"?

A. Could have been. I just don't remember.

 . . . . .

Q. Okay. Now Sheriff, you understand the difference between a 12 gauge shotgun and a .410 shotgun, don't you?

A. Yes.

Q. And you know the difference between a 12 gauge shotgun and say a .25 automatic pistol?

A. Yes, sir.

Q. Why did you take the .410 shotgun?

A. Because they said they'd found some .410 cartridges at the residence that this girl was found. And, well, I thought better to take it—it would be easier to take it now than to later come back and get it. So I'd rather take it and then return it to them, you know, than to leave it there and then have to go back and get a search warrant again.

 . . . . .

Q. You just took them in case they had something to do with the case?

A. Yes, um-hum. Like I said, I'd rather give it back—take them and then I can give them back easier than I can get another search warrant to go back to the residence.

Q. Okay. Is that normally how you do it on a search warrant?

A. Yes, sir.

. . . . .

Q. Okay. And as I understand it then, anything you thought might turn out to be evidence you were going to take, and if it wasn't evidence, you could give it back later.

A. Yes, sir. It's easier to give it back to them than it is to get a search warrant and go back out again.

The trial court's findings included:

As to the good faith exception to the exclusionary rule: The Court finds from the totality of the evidence as to the method and manner in which the affidavit was prepared and what it contained, the method and manner in which the application for search warrant was prepared and what it contained, the method and manner in which the search warrant was procured from the magistrate, that there can be no objective good faith belief by a police officer that such procedures would result in a valid search warrant and therefore, the good faith exception to the exclusionary rule is not applicable in this case.

■ Having determined that the search warrant was valid, the trial court's order that material or property be suppressed and excluded from evidence that was adequately described in the search warrant and was seized is erroneous. The shotgun was adequately described. It was lawfully seized. A search is not rendered unlawful with respect to property that is seized within the scope of the search warrant because the officers who executed it exceeded their authority as to other property. *Quandt Brewing Co. v. U.S.*, 47 F.2d 199, 201 (2nd Cir.1931). As stated in *McGuire v. U.S.*, 273 U.S. 95, 47 S.Ct. 259, 71 L.Ed. 556 (1927):

Nor does the unlawful distraint or attachment of certain articles make unlawful the seizure of property otherwise rightfully taken at the same time.

*Id.* at 99, 47 S.Ct. at 260.

The state has made no argument with respect to whether the part of the search warrant that directed that there be a search for and seizure of "evidence of destruction of personal items belonging to Valerie Taylor" met the requirements of § 542.276.10(5), RSMo Supp.1990, that property or material to be seized must be described with sufficient certainty to make it identifiable.

This court holds that the search warrant describes nothing other than the .12 gauge shotgun with sufficient certainty to make it identifiable. This court further holds that there is sufficient evidence in the record on appeal to sustain the trial court's determination that the search, to the extent that it extended to property other than the .12 gauge shotgun, was not conducted in good faith and, therefore, the additional items seized were properly suppressed and excluded from evidence.

■ The "good faith" exception to the exclusionary rule as established by *U.S. v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is based upon reasonable good faith reliance by law enforcement personnel on a facially valid search warrant. Under those circumstances, an otherwise defective search warrant will not cause evidence seized in response thereto to be excluded. *Id.* at 927, 104 S.Ct. at 3422–23. *See also State v. Gardner*, 741 S.W.2d 1, 8 (Mo. banc 1987). The conduct of the Sheriff of Wright County in the execution of the search warrant was inexcusable insofar as he knowingly sought and seized items beyond the scope of the search warrant that he was executing. There was no error by the trial court, plain or otherwise, in suppressing the items that were seized, other than the shotgun, and ordering those items excluded from evidence.

The order suppressing the .12 gauge shotgun that was seized from the premises located at 600 Chapman Street, Mountain Grove, Missouri, and excluding it from evidence is reversed. The order is sustained with respect to all other property and material seized from that location.

CROW, P.J., and SHRUM, J., concur.